## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John A. J.,                                          Case No. 21-cv-881 (TNL)

       Plaintiff,

v.                                                      **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

       Defendant.

Benjamin L. Reitan and Jacob P. Reitan, Reitan Law Office, PLLC, 1454 White Oak Drive, Chaska MN 55318 (for Plaintiff); and

Teresa Christenson, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff John A. J. brings the present case, contesting Defendant Commissioner of Social Security's denial of his applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross motions for summary judgment. ECF Nos. 18, 21.  Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 18, is **DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 21, is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that he has been disabled since July 2018 due to several impairments not relevant to the issues at hand.  Tr. 10, 57, 69, 85, 95.  As will be discussed in greater detail below, *see infra* Section IV.B.2.a, Plaintiff had a stroke in 2019.  Plaintiff's applications were denied initially and again upon reconsideration.  Tr. 10, 66, 78, 80, 81, 92, 102, 104, 105.

Plaintiff appealed the reconsideration of his DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ").  Tr. 10, 132.  The ALJ held a hearing in June 2020, and issued an unfavorable decision.  Tr. 10-24, 35-55.  Thereafter, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-3.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 18, 21.  This matter is now ready for a determination on the papers.

## III. ALJ'S DECISION

In relevant part, the ALJ found that Plaintiff had the severe impairment of "status post stroke with remaining left side deficits," and this impairment individually or in

combination with Plaintiff's other impairments did not meet or equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  Tr. 16.  As to Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform light work,[2] with the additional limitations that Plaintiff "may do no power gripping or power torquing with the left, non-dominant hand"; "may frequently handle with the left, non-dominant hand"; and could not use his left hand "for the manipulation of small objects or for rapid coordinated finger movements."  Tr. 16.

Based on Plaintiff's age, education, work experience, and residual functional capacity as well as the testimony of a vocational expert, the ALJ found that Plaintiff was capable of performing the representative job of shipping-and-receiving weigher.[3]  Tr. 23.  Accordingly, the ALJ concluded that Plaintiff was not under a disability.  Tr. 23-24.

## IV. ANALYSIS

### A.  Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he

---

[2] As set forth in the regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); *accord* 20 C.F.R. § 416.967(b).

[3] At times, the ALJ inadvertently referred to this job as a "*shopping* and receiving weigher."  Tr. 23 (emphasis added).

3

threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.  Frequent vs. Occasional Handling With the Left Hand

Plaintiff first asserts that the ALJ erred by including a limitation for *frequent* handling with his left hand instead of *occasional* handling in the residual functional capacity.

### 1. Residual Functional Capacity

A claimant's "residual functional capacity is the most [he] can do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 27 F.4th at 1360 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly,

"[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c). Plaintiff bears the burden to establish his residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

### 2. Relevant Medical Records

#### a. July 2019 Stroke

In approximately mid-July 2019, Plaintiff presented to the emergency room with "stroke-like symptoms." Tr. 833; *see* Tr. 730. Plaintiff reported that, two days ago, his left side was numb and he was unable to "move it properly" when he woke up. Tr. 838; *see* Tr. 832, 833, 835. A friend observed him "having slurred speech and left[-]sided weakness." Tr. 832. Plaintiff was noted to be "stuttering a lot" and his left hand was swollen. Tr. 838.

A CT scan of Plaintiff's head showed a "[l]arge area of hypoattenuation involving the right temporal, parietal and superolateral occipital lobes with small volume hemorrhagic conversion and regional mass effect with leftward midline shift." Tr. 839; *accord* Tr. 840, 836, 831, 829, 740, 726; *see* Tr. 730. These findings were "favored to represent a subacute right MCA distribution infarction." Tr. 839; *accord* Tr. 840, 836, 831, 829, 740, 726-07; *see* Tr. 730. Plaintiff was diagnosed with a "large right temporoparietal subacute appearing stroke with some midline shift" as well as concurrent "left-sided deficits and facial droop." Tr. 834; *see* Tr. 740.

Plaintiff refused further studies, additional interventions, and admission to the hospital. Tr. 837, 834. Plaintiff "was yelling at staff and kept repeating 'I have to go. I have things to do and I have to get out of here.'" Tr. 837. Plaintiff was "informed of the risk of leaving against medical advice," and ultimately left against such advice. Tr. 837; *see* Tr. 730.

Plaintiff returned to the emergency room the next day and was admitted to the hospital. Tr. 730, 731, 733; *see, e.g.*, Tr. 700-827. Plaintiff reported "left[-]sided weakness unchanged, and gait and speech disturbance." Tr. 731. Upon examination, "[f]ocal sensory deficits" were observed in Plaintiff's "left arm, left hand and left leg." Tr. 732; *see* Tr. 725. Plaintiff's speech was slurred and his gait was abnormal. Tr. 732. A neurologic exam at the time of admission, however, noted normal speech and no facial droop. Tr. 738. Plaintiff had full strength in his "right upper extremity with shoulder abduction, biceps flexion, triceps extension, finger abduction, [and] finger extension." Tr. 738-39. Plaintiff had "[m]inimally reduced shoulder abduction, biceps flexion, [and] triceps extension on the left" as well as "[m]ild weakness of finger abduction and finger extension" in his left hand. Tr. 739. Plaintiff's sensation was normal in his right upper extremity, but "[a]bsent to light touch in [his] left upper extremity." Tr. 739; *see* Tr. 725. An MRI of Plaintiff's brain revealed a "[c]onstellation of findings highly characteristic for evolving subacute ischemia involving the posterior distribution of the right middle cerebral artery territory." Tr. 771; *accord* Tr. 702; *see* Tr. 765 ("MRI today demonstrates subacute infarct in the posterior right MCA territory."); *see also* Tr. 724.

8

During a neurologic exam the next day, Plaintiff's speech was normal, he had "intact facial sensation," and "no facial asymmetry." Tr. 764; *accord* Tr. 760. Plaintiff continued to have full strength in his right upper extremity. Tr. 764; *accord* Tr. 760. Plaintiff also continued to have "[m]inimally reduced shoulder abduction, biceps flexion, [and] triceps extension on the left" with "[m]ild weakness of finger abduction and finger extension of the left hand." Tr. 764; *accord* Tr. 760. Plaintiff's sensation was "[i]ntact to light touch" in all of his extremities." Tr. 764; *accord* Tr. 760. "Left sensory extinction," however, was also noted. Tr. 764; *accord* Tr. 760. A physical therapist evaluated Plaintiff's range of motion and strength in his upper extremity, stating "no concerns noted." Tr. 720. An occupational therapy evaluation noted "mild left[-]sided weakness, incoordination and inattention." Tr. 717. Plaintiff was "provide[d] education on increasing [the] use of [his] left upper extremity into functional tasks." Tr. 717.

A two days later, Plaintiff was seen again by occupational therapy. Tr. 755. During the session, Plaintiff expressed "wanting to get his left arm functioning more efficiently." Tr. 756. It was noted that Plaintiff's right hand was his dominant hand. Tr. 756. Plaintiff was observed to have "mild difficulty with [his] left hand" while grooming. Tr. 756; *see* Tr. 757 ("continues to present with mild left[-]sided incoordination"). Plaintiff was able to "complet[e] basic self cares with supervision." Tr. 757. A physical therapy note from the same day described Plaintiff as "appear[ing] close to his functional baseline." Tr. 754.

A neurology progress note the next day indicated "[s]ensory changes in the left hemibody with intermittent difficulty distinguishing sharp and dull, torso sensation

preserved." Tr. 747. "There [wa]s a question as to whether these sensory changes [we]re due to sensory loss, neglect, or patient compliance." Tr. 747.

The following day, neurology discussed use of a "Holter monitor" for the next 30 days due to a "concern for possible embolic stroke secondary to atrial fibrillation." Tr. 741. Plaintiff "declined 30[-]day monitoring despite [his providers'] strong recommendations, and ultimately decided to leave against medical advice." Tr. 741. Plaintiff was "asked . . . to wait for a formal discharge summary, but . . . declined and left shortly thereafter." Tr. 741; *see* Tr. 730.

### b.  July through December 2019

A few days later, at the end of July, Plaintiff returned to the emergency room with a headache. Tr. 684, 679. "When asked to do [a] neurologic exam[, Plaintiff] refuse[d] to comply and state[d] 'I've done this three times already and I'm not doing it again.'" Tr. 681. It was noted that Plaintiff was "moving all 4 extremities without difficulty and there [wa]s no obvious cranial nerve deficit." Tr. 681; *see* Tr. 682 ("no focal neurological deficits today"). Plaintiff's "strength and sensation appear[ed] consistent with [his] discharge documentation and he had no new focal neurologic deficits." Tr. 682. There was "concern for hemorrhagic conversion of stroke," and a CT scan was ordered. Tr. 681; *see* Tr. 683-84, 677-78. No evidence of hemorrhagic conversion was noted and Plaintiff was discharged. Tr. 682-84.

Plaintiff had a consultation with neurology in early August. Tr. 674. Plaintiff "had no further stroke-like symptoms," but continued to have "residual left-sided symptoms." Tr. 675. Upon examination, Plaintiff had "sensory ataxia in the left upper extremity that

10

is severe, superimposed upon a pyramidal distribution hemiparesis, worst in the left upper extremity and reflex changes in conjunction with this." Tr. 675. It was recommended that Plaintiff be seen in physical medicine before returning to work. Tr. 675.

Approximately one week later, Plaintiff had a follow-up appointment related to his stroke. Tr. 670-71. It was noted that Plaintiff's "[n]eurological impairments have . . . continued to improve." Tr. 671. Plaintiff had "[i]ntact upper and lower extremity strength on the left side," although "[d]ecreased sensation to light touch and pinprick [was] noted on the entire left upper extremity." Tr. 672.

In mid-October, Plaintiff was evaluated by physical therapy. Tr. 659. Plaintiff reported that "his left side is heavy and uncoordinated, especially through the last three fingers of the left hand." Tr. 661; *see* Tr. 661 ("He is concerned about his left hand control. He feels he does not have adequate coordination of his last three fingers of the left hand."); *see also* Tr. 660 ("symptoms consist of abnormal sensory feedback on the left"). Plaintiff reported that "his status is worsening." Tr. 660.

Upon examination, Plaintiff had "[f]ull active range of motion throughout" and his "strength [wa]s grossly within normal limits." Tr. 661. The physical therapist had Plaintiff "working on manipulation of golf balls or of coins to work on his control." Tr. 661. "This [wa]s somewhat difficult for him and require[d] persistence." Tr. 661. Plaintiff was "able to carry a tray without tipping upside-down cones." Tr. 661. He was also "able to catch Swiss balls, requiring two[-]handed activity with occasional cues to the left hand." Tr. 661. Additionally, Plaintiff was "able to dribble and shoot a basketball today and found that surprising, as last time he attempted this he was not able." Tr. 661. The physical

11

therapist "encouraged [Plaintiff] to continue to work with the hand and to increase his activity in the gym in order to continue to improve his athletic mobility, which he wishes to regain." Tr. 661. In relevant part, the physical therapist "requested an order for [occupational therapy] to work on hand coordination." Tr. 661.

A few days later, Plaintiff met with occupational therapy. Tr. 652. Plaintiff reported, among other things, "decreased left upper extremity coordination and sensation." Tr. 653. Plaintiff was "independent with activities of daily living/instrumental activities of daily living except difficulty with tying shoes, holding items in his left, and cutting food." Tr. 653; *see* Tr. 655. Plaintiff was noted to have "decreased left upper extremity function" and "instructed on start[ing a] . . . home exercise program for sensory and neuromuscular re-education." Tr. 655.

Between the end of October and mid-November, Plaintiff had five sessions of occupational therapy. Tr. 642, 639, 635, 631, 627. Plaintiff "demonstrat[ed] decreased left fine motor coordination including in[-]hand manipulation, but improve[d] with repetition of tasks/exercises." Tr. 643; *see* Tr. 640 ("demonstrating decreased left fine motor coordination including in-hand manipulation with small objects"); *see also* Tr. 636, 629. Plaintiff was also "educated on the importance of using vision to assist with tasks" due to decreased sensation on the left. Tr. 643; *see* Tr. 640. In early November, Plaintiff reported "continued numbness in [his] left hand." Tr. 636. Around the middle of November, Plaintiff reported that he had "started working out at the gym." Tr. 628.

Plaintiff engaged in a variety of activities to work on his left-hand function. For example, Plaintiff did exercises requiring him to pick up and place or remove pegs from a

board.  Tr. 643, 640, 636, 628.  While Plaintiff "dropped approximately 25% [of the pegs] on [his] first attempt, . . . [he] improved with manipulating small pegs in hand with repetition."  Tr. 643.  Plaintiff worked on "in-hand manipulation" by "picking up 2-3 coins with [his] left [hand], placing [them] in [the] palm of [his] hand, [and] then working on bringing [them] to [his] fingertips one at a time."  Tr. 643.  Plaintiff "demonstrated difficulty dropping at 75% on [his] first attempt' and had "[m]ore difficulty with three coins, but [again] improv[ed] with repetition."  Tr. 643.  Plaintiff "worked on left pinch strength and coordination [by] picking up clothespins with varying resistance to place on [a] tower above shoulder height."  Tr. 636.  While Plaintiff had "more difficulty with firm resistance pins," he was "able to pinch and place dropping <10%."  Tr. 636.

Plaintiff's performance with these activities generally improved from session to session.  Tr. 640, 636.  At times, Plaintiff reported fatigue with reaching with his left upper extremity and rest breaks were required.  *See, e.g.*, Tr. 633 ("reported fatigue with left upper extremity reaching, but few rest breaks were required"); 628 (noting fatigue with reaching and rest breaks needed).  Plaintiff continued to struggle with "fine motor coordination including in-hand manipulation."  Tr. 629; *see* Tr. 633.

As part of a routine medical exam in mid-November, Plaintiff reported "ongoing upper and lower left-sided hemiparesis and sensory loss."  Tr. 623.  Plaintiff was noted to have "[d]iminished strength 3/5 in [his] upper and lower left extremities."  Tr. 624.  He also "[e]ndorsed subjective numbness in his left extremities as well."  Tr. 624.  In addition, Plaintiff "brought in an extensive amount of paperwork" he wanted "fill[ed] out to excuse him from work responsibilities in the setting of his post[-]stroke deficits."  Tr. 624.  The

provider told Plaintiff that she was "not comfortable saying that he is unable to be employed, as he is right-handed and has no right-sided deficits and his left[-]side deficits do not preclude him from working altogether in [her] medical assessment." Tr. 624.

Plaintiff had an additional four sessions of occupational therapy during the month of December.  Tr. 613, 610, 606, 602.  At the beginning of December, Plaintiff reported "intermittent tingling now in [his] left upper extremity." Tr. 614.  At his next appointment, Plaintiff "report[ed] using his left hand more during daily tasks such as pouring cream in his coffee."  Tr. 611; *see also* Tr. 608.  Plaintiff was encouraged to "use his left hand as much as possible throughout the day along with working on his home exercise program." Tr. 608; *see* Tr. 614.

Plaintiff continued to work on reaching, coordination, and grasping activities.  Tr. 614.  Plaintiff also continued to work on "fine motor coordination exercises and activities with rest/stretch breaks as needed with fatigue." Tr. 614; *see* Tr. 614 ("continues to report fatiguing quickly with fine motor tasks"); 611 ("Short rest/stretch breaks, but improved activity tolerance overall.").  While Plaintiff "continue[d] to demonstrate difficulty with fine motor coordination including motor processing," he was "improving overall." Tr. 611; *see* Tr. 607 ("improving with left hand coordination, but continues to demonstrate difficulty with motor processing speed tasks").  Plaintiff "demonstrated improved performance with in-hand manipulation and activity tolerance with coordination activities adding challenge with reaching." Tr. 611.

At his fourth visit, Plaintiff "report[ed] numbness in [his] 4th and 5th digits only on [his] left hand." Tr. 603; *see* Tr. 604.  Plaintiff "report[ed] being independent with self

cares and activities including opening containers." Tr. 603. Plaintiff demonstrated improved motor processing speed from his previous sessions. Tr. 603; *see* Tr. 603 ("improving speed and manipulating small objects in left hand"). Plaintiff also "worked on bilateral coordination activities including buttoning, [t]ying shoes, and dressing a baby as he has young children at home." Tr. 603. Plaintiff "completed [these] tasks independently given extra time and recommending [a] foot stool to reach feet for tying shoes." Tr. 603. Plaintiff "demonstrated improved strength and coordination" and met all of his occupational therapy goals. Tr. 603. Plaintiff was discharged from occupational therapy and directed to continue with his home exercise program. Tr. 604.

### c. 2020

Plaintiff had another follow-up appointment for his stroke in early January 2020. Tr. 597. Plaintiff reported that "he has completed physical therapy and . . . improved perhaps about 10%." Tr. 598. Plaintiff reported that "his strength has improved," but "[h]e continues to have residual sensory deficits on his left side, pretty much from head to toe." Tr. 598. Plaintiff again asked for disability paperwork to be completed. Tr. 598.

Upon examination, Plaintiff had "4/5 strength in his left upper and lower extremities." Tr. 600. It was further noted that he "[r]eport[ed] left sensory deficits from face, left arm, and left leg." Tr. 600. This provider also declined to complete the requested paperwork, noting: "As this is my 1st time seeing him and based on his neurologic examination, I do not feel that he has significant deficits that would preclud[e] him from working again in the future." Tr. 600. It was recommended that Plaintiff "return to physical therapy again to continue to work on brain rehabilitation." Tr. 600.

Approximately two weeks later, Plaintiff had another follow-up appointment where he again asked that disability paperwork be completed. Tr. 593. Plaintiff reported that "physical therapy has significantly helped his symptoms," he has had "significant improvement in his strength on his left side," and he "is continuing to undergo daily exercises." Tr. 600; *see* Tr. 601. Plaintiff's "main concern [wa]s residual numbness of his left hand and forearm." Tr. 593; *see* Tr. 601. Upon examination, it was noted: "cranial nerves 2-12 are normal except for decreased sensation of V2 and V3 distribution trigeminal nerve on the left. Decreased sensation of distal left upper extremity otherwise 5/5 throughout. 5/5 strength throughout. Normal finger-to-nose bilaterally." Tr. 594. This provider was likewise "unable to fill this [disability] paper today as based on our assessment we do not believe he meets the qualifications [sic] disability." Tr. 594; *see* Tr. 595; *see also* Tr. 592 ("He may not be able to perform certain jobs such as his prior factory work; however, we believe that he could find employment."). Plaintiff was referred to occupational medicine "to evaluate possible ongoing work restriction that may affect his future employment." Tr. 594; *see* Tr. 595, 592.

### d. Occupational Examination by Dr. Swift

Towards the end of January 2020, Plaintiff was seen by Melanie D. Swift, M.D., M.P.H., in occupational medicine "for an assessment of his workability pursuant to job search and documentation of his current disability status for potential benefits eligibility." Tr. 589. Upon examination, Dr. Swift noted that Plaintiff's arms were "equal in bulk and tone," there was "[n]o pronator drift" or tremor; and Plaintiff had full range of motion. Tr. 590. Dr. Swift additionally noted

16

> [l]oss of 2 point discrimination throughout [his] left hand . . . .
> On monofilament testing, [Plaintiff] could discern 60g
> monofilament, faintly, on palmar and dorsal aspects of [his
> left] hand and fingers. [Plaintiff] could barely discern a 15g
> monofilament on the back of [his] hand, but could not detect it
> on [his] fingertips or palm.

Tr. 590. Plaintiff's sensation was intact in his right hand. Tr. 590. Plaintiff was able to

perform "[r]apid alternating movements" normally with his right hand, but was "slightly

slowed with [his] left hand." Tr. 590. Plaintiff had "difficulty with coordination in the left

hand, as observed with misplacement of [his] fingers in the dynamometer, corrected only

with visual cues." Tr. 590. Plaintiff's grip strength was "90/120/125" pounds in his right

hand compared to "42/40/50" pounds in his left. Tr. 590. Plaintiff's "[p]incer grasp" was

"23/23/26" pounds in his right hand compared to "22/19/27" pounds in his left. Tr. 590.

Dr. Swift concluded that Plaintiff "definitely has weakness in the left upper hand

grip and sensory loss persisting in the left hand, making fine motor activities and

coordination difficult." Tr. 590. Dr. Swift opined Plaintiff needed "the following work

restrictions for safety purposes": (1) "[n]o tight gripping with the left hand requiring more

than 35 lb of force to lift or carry objects"; (2) "[n]o safety sensitive tasks with the left hand

that require fine motor coordination or sensation"; (3) no "work tasks that require rapid

coordinated finger movements, or manipulation of small objects, with the left hand"; and

(4) "[n]o work with temperature extremes on the left hand, including the potential for

spilling caustic chemicals or scalding hot liquids, due to increased risk of burn injury." Tr.

590. Dr. Swift noted that "[a]s [Plaintiff] is right-hand dominant, he can perform most

[activities of daily living] independently, but continues to struggle with buttoning shirts

and tying shoes." Tr. 590. Dr. Swift further noted that "[t]his is considered a disability under the ADA." Tr. 590. Dr. Swift advised Plaintiff to seek vocational rehabilitation services. Tr. 590.

### 3. Substantial Evidence Supports Frequent-Handling Limitation

As stated above, the ALJ determined that Plaintiff had the residual functional capacity to perform frequent handling with his left, non-dominant hand, but only occasional fingering and feeling. "Reaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work-related activities." *Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, SSR 85-15, 1985 WL 56857, at *7 (Soc. Sec. Admin. 1985). Handling activities include "seizing, holding, grasping, turning, or otherwise working primarily with the whole hand or hands" and are "required in almost all jobs." *Id.* Significant handling limitations "may eliminate a large number of occupations a person could otherwise do." *Id.*; *see Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional & Nonexertional Impairments*, SSR 83-14, 1983 WL 31254, at *4 (Soc. Sec. Admin. 1983) [hereinafter SSR 83-14] ("Unlike unskilled sedentary work, many unskilled light jobs do not entail fine use of the fingers. Rather, they require gross use of the hands to grasp, hold, and turn objects. Any limitation on these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work."). The ALJ concluded that Plaintiff could perform frequent handling, meaning handling

activities "occurr[ed] from one-third to two-thirds of the time." *Titles II and XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251, at *6 (Soc. Sec. Admin. 1983).

Plaintiff asserts that he should be limited to occasional handling, meaning "from very little up to one-third of the time." *Id.* at *5. According to Plaintiff, frequent handling with his left upper extremity is not consistent with his post-stroke medical records.[4] Plaintiff cites occupational therapy records between October and December 2019, noting decreased coordination and sensation, particularly fine-motor coordination to include in-hand manipulation of small objects. Plaintiff also cites the limitations identified by Dr. Swift.

In determining Plaintiff's residual functional capacity, the ALJ considered his occupational therapy records. The ALJ correctly noted that, when Plaintiff began occupational therapy in October 2019, "[h]e showed decreased left upper extremity function." Tr. 20. The ALJ recognized that although Plaintiff "reported being independent with activities of daily living and instrumental activities of daily living," he experienced "difficulty with tying shoes, cutting food, and holding items in his left hand due to decreased sensation and coordination." Tr. 20. The ALJ also correctly noted, however, that at the time of Plaintiff's discharge in December 2019, he had met all of his therapy goals; "reported being independent with self cares and activities including opening

---

[4] The Commissioner frames this argument as a challenge to the ALJ's evaluation of Plaintiff's subjective complaints. *See, e.g.*, Comm'r's Mem. in Supp. at 10-14, ECF No. 22. The Court disagrees. Plaintiff's argument is grounded in findings from the medical records. *See* Pl.'s Mem. in Supp. at 21-22.

containers"; and "demonstrated independence with bilateral tasks including tying shoes and buttoning." Tr. 20.

Plaintiff is correct that his occupational therapy records continued to demonstrate difficulty with fine motor coordination, including in-hand manipulation. Dr. Swift similarly opined that Plaintiff had limitations in his abilities to perform tasks with his left hand requiring fine motor coordination, rapid coordinated finger movements, and manipulation of small objects. Notably, the ALJ found Dr. Swift's opinion to be persuasive and *included* a limitation precluding Plaintiff from manipulating small objects and performing rapid coordinated finger movements with his left hand.

The ALJ also considered Plaintiff's physical therapy records from October 2019. Acknowledging that Plaintiff reported that his left side felt "heavy and [was] uncoordinated," the ALJ correctly pointed out that "[e]xam findings during physical therapy noted full active range of motion throughout, no abnormal tone, and strength grossly within normal limits." Tr. 19. The ALJ further pointed out that the physical therapist observed Plaintiff "was able to progress to more athletic type of activities." Tr. 19.

The ALJ likewise looked to medical records from January 2020. Here again, the ALJ recognized Plaintiff's ongoing complaints of strength and sensory deficits as well as continued numbness in his left upper extremity. At the same time, the ALJ correctly observed that the objective medical evidence showed that, while Plaintiff had some decreased sensation, he had between 4/5 and 5/5 strength in his left upper extremity. The ALJ additionally noted that both medical providers recommended that Plaintiff continue

with physical therapy for increased functioning and neither thought Plaintiff qualified for disability.[5] Ultimately, the ALJ appreciated that Plaintiff's "stroke certainly reduced" his functioning "for a while," but reasonably concluded that Plaintiff's "post stroke recovery also went fairly well" and the functioning in his left upper extremity improved overall. Tr. 17-18.

That it might be possible to reach a conclusion other than the one reached by the ALJ regarding Plaintiff's ability to handle with his left upper extremity based on the objective medical evidence is not a basis for reversal. *See Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) ("We may not reverse simply because we would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion."); *accord Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017); *see also, e.g.*, *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019); *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). The Court concludes that substantial evidence on the record as a whole supports the ALJ's finding that Plaintiff retained the residual functional capacity to perform frequent handling with his left upper extremity.

## C. Availability of Other Work

Plaintiff next asserts that the ALJ erred by not giving proper weight and consideration to the opinion of Kate Schrot, M.S., C.D.M.S., a rehabilitation consultant Plaintiff retained to respond to the testimony of the vocational expert. "[A]t step five, the

---

[5] On page 20 of the ALJ's decision, the ALJ wrote that one of Plaintiff's "treating provider[s] noted that [he] had significant deficits that would preclude him from working again in the future." Tr. 20 (citing 4F/30). There appears to be a typographical error here as the treating provider in fact stated on the cited page: "As this is my 1st time seeing him and based on his neurologic examination, I do *not* feel that he has significant deficits that would precluding [sic] him from working again in the future." Tr. 600 (emphasis added).

burden shifts to the Commissioner to show there are other available jobs in the economy."

*Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); *see Boyd v. Colvin*, 831 F.3d 1015,

1021 (8th Cir. 2016) ("Once it is established that the claimant cannot return to her previous

occupation, the Commissioner bears the burden to show that a significant number of

appropriate jobs exist for the claimant." (quotation omitted)).

### 1. Vocational Opinions

#### a. Vocational Expert

At the hearing, the ALJ asked the vocational expert to assume a hypothetical

individual who was capable of performing light work with, in relevant part, the additional

limitations of "no power gripping or power torquing with the left hand, and the left hand is

the non-dominant hand"; "frequent handling but only occasional fine fingering with that

non-dominant hand"; and "[t]he left hand cannot be used for manipulation of small objects

or for rapid coordinated finger movements . . . ." Tr. 45. The vocational expert testified

that such an individual was not capable of performing Plaintiff's past relevant work. Tr.

45. As to whether other work was available, the vocational expert testified that "the

limiting factor would be the occasional fingering and feeling" as "light jobs are typically

production-style, so if there is [sic] any jobs, it would probable be limited in number." Tr.

46. The vocational expert then looked to the *Dictionary of Occupational Titles* ("DOT"),

*see infra* Section IV.C.3.a, and identified the representative job of shipping-and-receiving

weigher, DOT 222.387-074.[6]   Tr. 48; *see* Tr. 46, 49.   In follow-up questioning,   the

---

[6] The vocational expert also identified the representative job of folding-machine feeder, DOT 920.686-018.  Tr. 48.
The ALJ did not, however, include this job because, pursuant to the DOT, it "requires frequent feeling" and the ALJ
"specified occasionally feeling with the left, non-dominant hand."  Tr. 23.  This is not challenged by either party.

vocational expert confirmed that the job of shipping-and-receiving weigher involved "occasional fingering and feeling" and "frequent handling" bilaterally.  Tr. 48; *see* Tr. 49. The vocational expert testified that there were 25,000 such jobs available in the United States.  Tr. 48.  The vocational expert further testified that his testimony was consistent with the DOT.  Tr. 49.

On cross examination, the vocational expert was asked by Plaintiff's counsel whether there would be any erosion in the number of jobs available "based on the limitations of only occasional use of the left hand for fine fingering."  Tr. 49.  The vocational expert testified that he did not know.  Tr. 49-50.

In light of the vocational expert's testimony, Plaintiff's counsel sought and was granted leave to submit additional vocational evidence on the issue of how many jobs would be available in light of the limitation to only occasional use of the left hand for fine fingering.  Tr. 51-54.

### b.  Schrot

Following the hearing, Plaintiff submitted Schrot's opinion.  Schrot opined the job of shipping-and-receiving weigher was not available to someone "with limitations on the frequency of use of an upper extremity."  Tr. 298.

Schrot began by comparing the DOT's description with the description found in the Occupational Information Network (O*NET) database, *see infra* Section IV.C.3.a.  Tr. 297.  Schrot noted the job of shipping-and-receiving weigher is identified as light, unskilled

work in the DOT, "requir[ing] occasional reaching and frequent handling and fingering."[7]

Tr. 297.  O*NET, on the other hand, identified the job of shipping-and-receiving weigher

as "semi-skilled" and "[p]hysical demands include the need to use the hands continuously."

Tr. 298.  Schrot noted that the O*NET data "was updated between 2008 and 2018."  Tr.

298.

    Schrot opined:

> The DOT descriptions[8] fit the hypothetical for light unskilled
> work.  The O*NET identifies the jobs as semi-skilled.  It also
> notes that the jobs require the ability to use the hands and arms
> continuously to handle, control and manipulate objects.  Based
> on the need to use the hands and arms continuously[,] it would
> make it difficult if not impossible to use the [left upper
> extremity] only on an occasional basis while performing the
> job.  These jobs are generally performed at a moving conveyor
> belt and it is necessary to keep up with the speed of the belt.
> Restricting the use of the [left upper extremity] would likely
> interfere with the ability to work at the required speed.  The
> O*NET descriptions are more accurate since they have been
> updated more recently than the DOT descriptions which were
> last updated more than 40 years ago.  Manufacturing has
> changed significantly in the past 40 years, specifically that
> machines in manufacturing settings are either computer
> controlled or use robots.  This means that workers need
> computer operation skills in most settings.

Tr. 298; *see also* Tr. 298 ("Jobs in manufacturing have changed considerably since the last

publication date of the DOT.  Those changes have included the need for the worker to have

more skills, such as software experience, since the machinery is computer driven,

sometimes driven by robots.  This results in the worker having [to] meet production

---

[7] *See infra* n. 10 and accompanying text.
[8] Schrot's opinion was rendered in the plural as she analyzed both the shipping-and-receiving weigher and folding-machine feeder jobs.  *See supra* n.6.

standards set by the computers and at speeds much faster than 20 years ago."). It was Schrot's opinion "that neither of the two positions identified fall within the ALJ's hypothetical and therefore cannot be considered." Tr. 298.

Schrot further opined that, based on her "many years of experience working with employers and placing employees with physical limitations in jobs, [she did] not see any way the identified jobs could be performed with limitations on the frequency of use of an upper extremity." Tr. 298. Schrot explained:

> I have worked with clients in both of these types of jobs and have observed them performed in a number of different industries, including paper products, food products and small manufactured parts. When I worked with an employer to try and return an injured worker to these types of positions[,] there were usually problems with meeting production demands if both hands and arms could not be used frequently to continuously. Generally, the employer would ultimately try and identify a different job that did not have production requirements in order to successfully return the employee to work. The work tasks do not easily allow for accommodations that include limitations on the frequency of the use of one of the upper extremities.

Tr. 298.

## 2. ALJ's Treatment of the Vocational Opinions

In the decision, the ALJ explained that, "[p]ursuant to SSR 83-14, . . . [he] carefully considered, by asking the vocational expert and having discussion at the hearing, whether jobs [we]re available at the light exertional level with the fingering and feeling restrictions posed by the residual functional capacity." Tr. 23 (citation omitted); *see* SSR 83-14, 1983 WL 31254, at *4. The ALJ noted that the "[t]he vocational expert further testified that the numbers for the cited occupation may be reduced by the limitations by a little bit more, but

per the [DOT] the cited occupation does not require more than what is indicated in the residual functional capacity." Tr. 23. The ALJ did not find Schrot, "the vocational expert contracted by the representative[,] to be persuasive, as her affidavit [wa]s not consistent with the [DOT]." Tr. 23 (citation omitted). The ALJ explained that Schrot's affidavit "states that the job of shipping[-]and[-]receiving weigher is a semi-skilled to skilled position, from SVP 4 to SVP 6, whereas the DOT code listed is SVP 2." Tr. 23.

Based on the testimony of the vocational expert at the hearing, the ALJ concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" when "considering [his] age, education, work experience, and residual functional capacity." Tr. 23.

### 3.  ALJ Properly Relied on the Testimony of the Vocational Expert

#### a.  DOT vs. O*NET

"In making disability determinations, [the Social Security Administration] rel[ies] primarily on the DOT (including its companion publication, the [*Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*] for information about requirements of work in the national economy." *Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p, 2000 WL 1898704, at *2 (Soc. Sec. Admin. Dec. 4, 2000) [hereinafter SSR 00-4p]; *accord Moore v. Colvin*, 769 F.3d 987, 989 n.2 (8th Cir. 2014). As to the availability of jobs existing in the national economy, the regulations provide that the Social Security Administration "will take administrative notice of reliable job information from various governmental and other publications." 20 C.F.R. § 404.1566(d);

*accord* 20 C.F.R. § 416.966(d); *see also* SSR 00-4p, 2000 WL 1898704, at *2. The regulations specifically list the DOT as an example of one such publication. 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1); *see, e.g.*, *Mindy S. v. Kijakazi*, No. 7:21-CV5008, 2022 WL 2905739, at *10 (D. Neb. July 22, 2022); *Kennedy v. Colvin*, No. 2:13-cv-02253, 2014 WL 7335539, at *4 (W.D. Ark. Dec. 22, 2014); *see also, e.g.*, *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 317 (6th Cir. 2020) (order).

"The Department of Labor . . . developed the DOT in the late 1930s to match jobseekers to jobs." *Benefit Offset National Demonstration*, Soc. Sec. Admin., https://www.ssa.gov/disabilityresearch/ois_project_faqs.html (last accessed Sept. 26, 2022). "For almost 50 years, the DOT has been [the Social Security Administration's] primary source for occupational information." *Id.* "The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." SSR 00-4p, 2000 WL 1898704, at *3; *see, e.g.*, *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) ("A claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range. The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." (quotations and citations omitted)). "The [Department of Labor] discontinued updating the DOT in 1991, and replaced it in 1998 with another job placement tool, the Occupational Information

Network (O*NET)." *Benefit Offset National Demonstration*, Soc. Sec. Admin., https://www.ssa.gov/disabilityresearch/ois_project_faqs.html (last accessed Sept. 26, 2022); *see, e.g.*, *Wainscott v. Kijakazi*, No. 21-cv-5119, 2022 WL 1310158, at *2 (W.D. Ark. May 2, 2022) (noting DOT last updated in 1991); *Kennedy*, 2014 WL 7335539, at *4 (same).

"The regulation[s] do[] not list O*NET as a reliable source" of job information.[9] *O'Neal*, 799 F. App'x at 317; *accord Kennedy*, 2014 WL 7335539, at *4. In fact, the Social Security Administration "studied whether O*NET could take the DOT's place in [its] disability adjudication process but found it does not describe the physical requirements of occupations at the level of detail needed for claims adjudication." *Benefit Offset National Demonstration*, Soc. Sec. Admin., https://www.ssa.gov/disabilityresearch/ois_project_ faqs.html (last accessed Sept. 26, 2022); *see O'Neal*, 799 F. App'x at 317 ("And, in fact, in 2010, the [Social Security Administration] determined that O*NET in its current form was not suitable for disability claims adjudication."). "[R]ecogniz[ing] the potential issue with obsolete occupational data," the Social Security Administration "is currently developing its own primary source of occupational information . . . to replace the DOT in

---

[9] To be clear, that is not to say that O*NET is not a reliable source of job information. *See* SSR 00-4p, 2000 WL 1898704, at *2 ("Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a [vocational expert's] or a [vocational specialist's] experience in job placement or career counseling."), 3 ("A [vocational expert], [vocational specialist], or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT."); *see also, e.g.*, *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014) (noting SSR 00-4p permits an ALJ to "rely on information about a particular job's requirements available in other reliable publications, information obtained directly from employers, or from a [vocational expert's] experience in job placement or career counseling" when crediting a vocational expert's testimony over a DOT listing (quotation omitted)); *Kennedy*, 2014 WL 7335539, at *4 n.3 ("Although the DOT is relied on for job information, O[*]NET may be useful when it is referenced by the [vocational expert] or ALJ and incorporated in the record.").

the disability adjudication process." *O'Neal*, 799 F. App'x at 317 n.1; *see Occupational*

*Information System Project*, Soc. Sec. Admin., https://www.ssa.gov/disabilityresearch/

occupational_info_systems.html (last accessed Sept. 26, 2022) ("In order to continue to

make accurate decisions, we must have information that reflects current occupations and

their requirements. As a result, we are developing a new Occupational Information System

(OIS), which will replace the DOT as the primary source of occupational information

[Social Security Administration] staff use in our disability adjudication process.").

### b.  No Conflict with DOT

The Eighth Circuit Court of Appeals has "consistently held that if substantial

evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there

was no conflict between the vocational expert's testimony and the DOT, the ALJ properly

relied on the testimony." *Courtney v. Comm'r, Soc. Sec. Admin.*, 894 F.3d 1000, 1004 (8th

Cir. 2018) (quotation omitted); *see also, e.g.*, *Tywford v. Comm'r, Soc. Sec. Admin.*, 929

F.3d 512, 519 (8th Cir. 2019); *Moore*, 623 F.3d at 605.

According to the DOT, the following represent duties of a shipping-and-receiving

weigher:

> Weighs and records weight of filled containers, cargo of loaded
> vehicles, or rolls of materials, such as cotton, sugarcane, paper,
> cloth, plastic, and tobacco, to keep receiving and shipping
> records: Reads scale dial to ascertain weight and records
> weight on ticket, product, or material; or subtracts tare from
> gross weight to obtain net weight of product or material; or
> inserts ticket into automatic scale recorder that prints weight
> on ticket.  May convey objects to scale, using handtruck, and
> lift objects onto scale.  May record information on weight
> ticket, such as grade and yardage.

DOT 222.387-074, 1991 WL 672108.  This job is classified as light work with a specific vocational preparation level of 2.  *Id.*  It involves frequent handling; occasional reaching and fingering[10]; and no feeling.  *Id.*  The hypothetical posed by the ALJ to the vocational expert contained the relevant limitations of frequent handling and occasional fingering.  As to the shipping-and-receiving weigher job, there is no dispute that the vocational expert's testimony did not conflict with the DOT.  *Contra, e.g.*, *Moore*, 769 F.3d at 989-90; *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 632-33 (8th Cir. 2014).  Even Schrot acknowledged as much.  In sum, "the ALJ described [Plaintiff's] limitations to the [vocational expert], the [vocational expert] responded with [a] possible job[], and the [vocational expert's] testimony did not conflict with the DOT."  *Courtney*, 894 F.3d at 1005.  Accordingly, the ALJ was entitled to rely on the vocational expert's testimony regarding the availability of the shipping-and-receiving weigher job.  *Id.*; *Moore*, 623 F.3d at 605; *see Wainscott*, 2022 WL 1310158, at *2; *see also O'Neal*, 799 F. App'x at 317.

As with Plaintiff's residual functional capacity and his ability to handle with his left upper extremity, that it might be possible on this record to reach a conclusion other than the one reached by the ALJ regarding the availability of the shipping-and-receiving weigher job is not a basis for reversal.  *See, e.g., Dols*, 931 F.3d at 744; *Fentress*, 854 F.3d at 1021; *Igo*, 839 F.3d at 728; *Goff*, 421 F.3d at 789.  "It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."  *Dols*, 931 F.3d at 746.  "A vocational expert's testimony based on a properly phrased

---

[10] Schrot's statement that the DOT's description of the shipping-and-receiving weigher job required "frequent . . . fingering" was therefore incorrect.  Tr. 297.

hypothetical question constitutions substantial evidence." *Goff*, 421 F.3d at 794. Accordingly, the ALJ's conclusion that there was other work available that Plaintiff could perform is supported by substantial evidence on the record as a whole.

## V. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 18, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 21, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September___29___, 2022          _____*s/ Tony N. Leung*_____
                                         Tony N. Leung
                                         United States Magistrate Judge
                                         District of Minnesota


                                         *John A. J. v. Kijakazi*
                                         Case No. 21-cv-881 (TNL)